UNITED STATES v. JACKSONVILLE FOR-
WARDING CO.

(Circuit Court of Appeals, Fifth Circuit.
March 22, 1927.)

No. 4758.

1. Pilots ⬅14—Local pilot, employed and on bridge of ship, is presumed to be in charge of her movements.

Where a local pilot is employed for an occasion, and is actually on the bridge of the ship, it is always to be presumed, in the absence of positive evidence to the contrary, that he is in charge of her movements.

2. Towage ⬅15(2)—Tugs employed to assist a ship through a channel from her dock to the main channel of the river held not in fault for her grounding.

Grounding of a ship, when leaving her dock after loading, and moving under her own power in charge of a pilot through a channel from the dock to the main channel of the river, held, under the evidence, not due to negligence or improper management of two tugs employed to assist her, but to insufficient depth of water in the short channel.

Appeal from the District Court of the United States for the Southern District of Florida; Rhydon M. Call, Judge.

Suit in admiralty by the United States, owner of the steamship New Windsor, against the Jacksonville Forwarding Company. Decree for respondent, and the United States appeals. Affirmed.

For opinion below, see 13 F.(2d) 925.

Edouard F. Henriques, Sp. Asst. Atty. Gen., Clinton M. Hester, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., and Francis L. Poor, Asst. U. S. Atty., of Jacksonville, Fla. (Wm. M. Gober, U. S. Atty., of Tampa, Fla., and Arthur M. Boal, Admiralty Counsel, U. S. Shipping Board, of Washington, D. C., on the brief), for the United States.

George C. Bedell, of Jacksonville, Fla. (Chester Bedell, of Jacksonville, Fla., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. This is a libel in personam to recover damages occasioned the steamship New Windsor, owned by appellant, alleged to have been caused by the negligence of the tugs Volunteer and St. Johns, owned by the appellee, in allowing that vessel to ground while being towed by said tugs. The parties will be hereafter referred to as libelant and respondent. The District Court found that libelant had not sustained the burden of proving negligence on the part of the tugs, and further was guilty of laches in delaying the bringing of suit for three years, and entered judgment accordingly, to reverse which this appeal is prosecuted.

It appears that the steamship New Windsor, of 5,590 gross tons, 400 feet 5 inches in length, 54 feet 2 inches in breadth, and 30 feet 4 inches in depth, took on a cargo of phosphate at the dock of the Cummer Com-

pany at Milldale, a suburb of Jacksonville, on the St. Johns river. She finished loading at 8:30 p. m. July 3, 1920, and at 11 p. m. the same day, with the assistance of the tugs Volunteer and St. Johns, attempted to leave the dock. At that time she was drawing 24 feet 4 inches forward and 24 feet 8 inches aft. There were 26 feet of water in the dock where she had loaded, and a channel about 150 feet wide had been dredged to connect the dock with the main channel of the river. She was lying head in and attempted to back out from the dock into the river with the assistance of the tugs, but also using her own power, with her engines going full speed astern. When she had just about cleared the head of the dock, she went aground in the narrow connecting channel, and was not floated for about two days thereafter, and not until she had discharged 100 tons of fresh water and considerable fuel oil. She then proceeded on her voyage, apparently not having been damaged sufficiently to require temporary repairs to make her seaworthy.

It is contended on behalf of libelant that the undocking of the vessel was solely in charge of the master of the tug Volunteer and that the tugs did not have sufficient power to hold the ship against the current, in consequence of which she went aground on the edge of the channel.

Frost, who commanded the New Windsor, Spaulding, the captain of the Volunteer, the local pilot, Starratt, and Burke, the third officer of the ship, were all on the bridge. Capt. Frost testified that the captain of the Volunteer gave all the orders for the movement of the ship; but this testimony, given more than three years after the accident, is very much weakened by a protest under oath which he filed four days after his ship grounded, in which he stated the pilot was in command. The pilot, Capt. Starratt, is very indefinite in his recollection as to whether he gave any orders regarding the movement of the ship in leaving the dock, but Capt. Spaulding testifies clearly and convincingly that the pilot gave all the orders for the movement of the ship and that he transmitted them to the tugs by blowing a small whistle. The third officer handled the telegraph from the bridge to the engine room of the ship. He testified that Capt. Spaulding gave the orders as to the movement of the ship's engines, and also gave the orders for casting off her lines from the dock. Hodges, second officer of the ship, who was on the after end of her in charge of casting off those lines, testifies he did not know who

gave the orders to cast off, as they were given through a megaphone. McGiffin, the head stevedore, who was on the dock with some men to let the lines go, testifies the orders to cast off were given by Capt. Starratt and transmitted through the mates.

Capt. Frost testified that, before undocking his ship, he had gone out and taken soundings with a hand lead line in the channel, and that he found 26 feet. This method of sounding in a narrow dredged channel is criticized, on the ground that it should have been done with a pole, as a hand lead would have a tendency to slip off the sloping sides of the channel and find the greatest depth, thereby giving a false impression as to the real depth of water.

Houston, who commanded the St. Johns at that time, testified that the water where the ship grounded was as deep as anywhere in the channel, and she was practically in the center of the channel, only a little to one side, and that the next day he took soundings, and found 24 feet 6 inches of water on both sides of her.

Capt. Mickler, an experienced pilot and member of the same association as Capt. Starratt, whose regular turn it would have been to take the vessel to sea, testified that, when he was told the vessel drew 25 feet of water, he declined to assume the responsibility of taking her from the dock. He further testified that in between the head of the dock and the channel was a moving bar, on which there was not over 17 to 18 feet of water. There is also testimony tending to show that, when the tugs were engaged, respondent's manager declined to assume any responsibility when told that the ship drew 25 feet. This is strengthened by the fact that the bill of respondent for services in assisting to get the ship off the shoal, as well as for the initial services, was promptly paid without protest.

[1] It is evident from the above that there is strong conflict in the evidence as to who was actually in command of the movement of the ship in leaving the dock and as to the depth of water in the channel. However, it is always to be presumed, in the absence of positive evidence to the contrary, that a local pilot employed for the occasion and actually on the bridge is in charge of the navigation of the ship, subject to the authority of her master.

[2] We fail to find in the record any evidence, except as may be inferred from the accident, that the tugs did not have sufficient power to perform the services for which they were engaged, or that there was any

poor seamanship in their handling. It is evident they were employed merely to assist the ship, moving out under her own power to safely navigate the narrow channel until she could swing out into the main channel of the river, and it is also evident that the ship grounded because she was too deeply loaded to safely navigate the channel connecting the dock with the main channel in the river. The tugs were not employed for such towage services as would cause the captain of either to assume command, and it is reasonable to infer that the pilot was employed to safely guide her through what was clearly the most dangerous part of her voyage to the sea, and that he was in fact in command.

On the whole record we agree with the District Court. As this disposes of the case on the merits, it is unnecessary to consider the plea of laches.

Affirmed.