**LYKES BROS. STEAMSHIP CO., INC., a corporation, and United Kingdom Mutual Steamship Assurance Association (Bermuda) Ltd., Plaintiffs,**

v.

**The GREAT LAKES TOWING COMPANY, Defendant.**

**Civ. A. No. 86–C–161.**

United States District Court,
E.D. Wisconsin.

March 10, 1989.

Michael A. Snyder, for plaintiffs.

Harney B. Stover, Jr., Milwaukee, Wis., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

REYNOLDS, Senior District Judge.

### FINDINGS OF FACT

1. The parties stipulate that the complaint is amended to include Lykes Bros. Steamship Co., Inc.'s protection and indemnity insurer, United Kingdom Mutual Steamship Assurance Association (Bermuda) Ltd., as an additional party plaintiff to the extent of $174,000.00 of the claimed damages which it paid to the City of Milwaukee.

2. Plaintiff, Lykes Bros. Steamship Co., Inc. ("Lykes"), is a foreign corporation with its principal office and place of business located at New Orleans, Louisiana. Defendant, The Great Lakes Towing Company ("GLT"), is a foreign corporation with its principal office and place of business located at Cleveland, Ohio, and with a local office and place of business located at Milwaukee, Wisconsin. The tugs TEXAS, MISSISSIPPI and WASHINGTON are not proper parties to this action because the complaint was never verified and was never served upon them, and there has been no voluntary appearance or claim filed on their behalf.

3. Lykes is the owner and operator of the S/S MARJORIE LYKES, a steamship approximately 592 ft. in length and 69 ft. in breadth. The ship has a steam turbine engine capable of delivering 11,000 shaft hp. to a single propellor, or screw, and is fitted with an 800 hp. bow thruster.

4. GLT is the owner and operator of the tugs TEXAS, MISSISSIPPI and WASHINGTON, all of which are harbor towing vessels approximately 81 ft. in length and 20 ft. in breadth. Each tug is powered by a 1,200 intermittent hp., 1,050 continuous hp., diesel engine with electric drive. All three of the tugs were of the same configuration and equipped with "mustache" type bow fenders about 2 ft. in width and wrapped around the tugs' bows on platforms constructed for that purpose. The tugs TEXAS and WASHINGTON were equipped with new towlines. The testimony concerning the size and composition of the towlines was inconsistent. However, based on the testimony of the engineer in charge of tug maintenance, the court finds that each towline was made up of a 150 ft. length of approximately 136,000 lb. tensile strength 2¼ in. diameter, 7 in. circumference, super polyester or high strength esterlon line shackled by a thimble to a 50 ft. pendant of 1 in. IWRC Improved Plow Steel cable having a breaking strength of approximately 90,000 lbs. Each tug's pulling or pushing power (bollard pull) was about 22,500 lbs. The TEXAS and MISSISSIPPI were built in 1916 in Cleveland, Ohio, and were rebuilt in 1957 and 1951, respectively. The WASHINGTON was built in 1925 and was rebuilt in 1951.

5. GLT's Schedule of Terms, Conditions & Rates, Effective 1 May 1983 (Tariff), was mailed to Lykes and the Great Lakes agent of Lykes on April 28, 1983, and was received by Lykes and its Great Lakes agent prior to May 7, 1983. Among other things, the Tariff provided:

(B) PERSON IN COMMAND. Towing service is rendered on the basis that the master, pilot or other person in charge of the vessel served is in command of the movement of the vessel, regardless of the number of tugs used.

(C) STRIKES, BREAKDOWNS, ETC. Great Lakes shall not be responsible for any expenses, losses, damages or claims whatsoever caused by or resulting or arising from the failure or delay in the performance of service due to ... breakdowns....

(F) OWNER RESPONSIBILITIES. The owner, operator, or charterer of any vessel served by one or more tugs agrees to hold Great Lakes and its tug or tugs free of claims for damage occasioned to such vessel by, or in any way contributed to by conditions beyond [Great Lakes'] control, such as, but not limited to: ... Choice of time of vessel's movement.

....

(H) APPLICABILITY OF PROVISIONS.... Great Lakes specifically disclaims any implied warranties of workmanlike service or seaworthiness by or of any tug, or by Great Lakes in connection with any service rendered.

6. Before the 1983 season of navigation on the Great Lakes, GLT reduced the size of its tug crew from four to three persons aboard each tug in order to meet competition from other towing companies which were operating with three person tug crews. Due to the reduction in crew size, there was no one on continuous duty in the engine room of the Great Lakes tugs.

7. During the morning of May 7, 1983, the S/S MARJORIE LYKES was enroute from the lower Great Lakes to Terminal No. 4 at the Port of Milwaukee, Wisconsin, carrying a partial cargo for discharge at Milwaukee and intending to load cargo there. There was a registered Great Lakes pilot, Earl McKnight ("Pilot McKnight"), aboard the ship who had come aboard at the St. Clair River in the vicinity of Detroit, Michigan. It was the policy of Lykes always to hire a local pilot to assist in docking.

8. During the morning of May 7, 1983, the ship's master, Captain Michael Soehnlein ("Captain Soehnlein"), listened to the National Weather Service's forecast several times and felt it was not alarming. However, at 1034 hours (10:31 a.m.) and thereafter, the weather service issued gale warnings for the southern one-third of Lake Michigan with winds 25–34 knots (29–40 m.p.h.) shifting northeast, and waves of 4 to 7 feet increasing to 6 to 10 feet by evening. Captain Soehnlein was apparently unaware of this forecast, as the official log entry prepared on May 9, 1983, states that there were "unforecast, high, gusty and shifting winds" at 1633 hours (4:33 p.m.) on May 7, 1983.

9. Sometime late morning on May 7, 1983, Captain Soehnlein determined that he would require the assistance of one tug to make the Terminal No. 4 dock. He called the ship's Great Lakes' agent, Kerr Steamship Co., at Milwaukee, and asked the agent to order one tug.

10. A gang of longshoremen was ordered for 1300 hours (1:00 p.m.) from the Milwaukee stevedore. Once ordered, they had to be paid for a minimum of four hours work. Linehandlers for mooring the ship were to be provided by the longshore gang.

11. Shortly before noon, the ship's Great Lakes' agent called GLT's dispatcher at Cleveland, Ohio, and ordered one tug to assist the S/S MARJORIE LYKES to dock at the Terminal No. 4 dock. Thereafter, at 1250 hrs. (12:50 p.m.), the tug TEXAS, under the command of Captain Jack Bohl with two other crew members aboard, was dispatched from GLT's Milwaukee tug office to meet the S/S MARJORIE LYKES and assist her from the outer harbor to the Terminal No. 4 dock. (Captain Bohl normally commanded the tug MISSISSIPPI, but due to the engineer's unfamiliarity with the equipment board on the MISSISSIPPI, Captain Bohl and crew boarded the TEXAS.) This was the first time the TEXAS had been used following the winter layup.

12. At about 1305 hrs. (1:05 p.m.), the tug TEXAS arrived at the outer harbor, and those aboard could see the S/S MARJORIE LYKES approaching the breakwa-

ter entrance to the Port of Milwaukee. At 1307 hrs. (1:07 p.m.), the S/S MARJORIE LYKES passed through the breakwater entrance and at 1313 hrs. (1:13 p.m.), the ship turned inside the outer harbor and prepared to back into the 300 ft. wide dredged slip along the Terminal No. 4 dock and moor port side to the dock, heading out in a northeasterly direction.

13. At 1318 hrs. (1:18 p.m.), the TEXAS secured a line to the starboard quarter of the ship. The ship then backed her engines to approach and enter the slip stern first, with the tug TEXAS assisting at the ship's starboard quarter aft. The ship handled the position of her own bow with her bow thruster and told the tug what to do.

14. At the time of the first attempt to dock the MARJORIE LYKES, the winds were blowing from the north/northeast at a speed of 20–21 knots, with gusts from 25–34 knots (approximately 25–30 m.p.h.) and the seas in the outer harbor were about 3–4 ft. in height.

15. Prior to the commencement of the maneuver, the ship's pilot and the tug's captain communicated on the radio-telephone. It was agreed that if the ship had any problem in making the dock, the maneuver would be abandoned and the ship would come ahead out of the slip and go to anchor in the outer harbor.

16. As the ship backed toward the slip stern first, the ship's pilot and the tug captain engaged in another radio-telephone conversation. The ship's pilot told the tug's captain that the ship was having trouble controlling her bow, and the tug's captain told the pilot that the tug TEXAS was having an engine heating problem. The first docking maneuver was aborted at 13:40 hrs. (1:40 p.m.), and the ship proceeded to anchor in the outer harbor.

17. To prevent a tug's engine from freezing during winter, the water in the cooling systems is replaced with alcohol. It is necessary to remove the alcohol from the engine following winter layup to prevent overheating.

18. The TEXAS overheated due to inadequate removal of the alcohol from its engine's cooling system following winter lay-

up and evaporation of the alcohol during maneuvers.

19. Notwithstanding the tug TEXAS's overheating, the ship was forced to abandon the docking attempt because of the high winds.

20. At 1349 hrs. (1:49 p.m.), the MARJORIE LYKES went to anchor in the outer harbor and requested the assistance of an additional tug. At approximately 1530 hrs. (3:30 p.m.), GLT supplied the tug WASHINGTON which was commanded by Captain Louis Toth.

21. Later, at about 1530 hrs. (3:30 p.m.), engineer Andy Mueller, of the tug WASHINGTON, was requested to remedy the problem with the TEXAS' engines. He boarded the tug TEXAS and observed the gauge glass which indicated insufficient coolant in the engine. Mueller added some water to the engine cooling system and boarded the tug WASHINGTON.

22. Captain Toth informed Pilot McKnight that the engine heating problem of the tug TEXAS had been taken care of and that both tugs were ready to go. Pilot McKnight asked Captain Toth if he thought that the ship could make the dock with the assistance of two tugs. Captain Toth told him that the decision was Pilot McKnight's, and that the tugs would do their best to assist the ship.

23. At the start of the second docking attempt, the wind from the north/northeast had picked up to about 30–35 m.p.h. and the seas were about 4–6 ft. in height.

24. Pilot McKnight advised both tug captains that the ship was going to attempt to come into the dock. However, he said that the ship would attempt to dock bow-first, instead of stern-first as in the previous attempt, with one tug assisting at the ship's bow and one tug assisting at the ship's stern. He indicated that he intended to take the vessel up the harbor, turn to port and have the two tugs take their positions at the ship's port quarters, forward and aft, to assess the ability of the tugs to hold the ship against the wind.

25. At this time Captain Bohl suggested to the ship's pilot that an alternative and safer maneuver would be for the ship to work ahead and come alongside the outer (easterly) face of the dock with her port side. Then the two tugs and the ship, with the use of ship's lines ashore, could warp the ship around the dock corner and put her into the Terminal No. 4 dock stern-first, port side to the dock as originally desired. Captain Soehnlein indicated that the ship was not equipped for such a maneuver and rejected it.

26. At 16:04 hrs. (4:04 p.m.), the S/S MARJORIE LYKES weighed anchor and proceeded northerly in the outer harbor and turned to port to put herself in a position north of the Terminal No. 4 dock and the slip alongside it, but parallel to it, almost broadside to the wind.

27. With the defendants' tugs TEXAS and WASHINGTON positioned fore and aft, respectively, against the port side of the ship, the tugs pushed against the MAR-JORIE LYKES to test whether the tugs could hold the ship against the wind.

28. During the test of the tug's ability to handle the MARJORIE LYKES against the wind, the tugs were successful in maintaining the MARJORIE LYKES' position.

29. Based upon the test, Captain Soehnlein and Pilot McKnight were satisfied that the two tugs and the ship's bow thruster could hold the ship against the wind. They then allowed the ship to drift to the south, being pushed by the wind, until the ship was in a position where it was headed toward the slip alongside the Terminal No. 4 dock. At 1626½ hrs. (4:26:30 p.m.) the ship proceeded slow ahead for 1½ minutes and then half ahead for 1½ minutes toward the slip. Thereafter, at 1629¾ hrs. (4:29:45 p.m.) the ship backed on her engines, working them full astern and then emergency full astern for 2¼ minutes. The action of the ship working full astern and emergency full astern caused the ship's stern to swing to port and widened the angle of the ship's approach to the dock.

30. The proper alignment to enter the slip under the stormy conditions then existing, with a strong wind from the north/northeast and fairly heavy seas running in the outer harbor, was for the ship to enter the slip parallel to the dock or with her stern slightly up into the wind so that when the ship backed down on her engines, which would cause her stern to swing to port, she would come into the slip in parallel alignment with the dock. Captain Soehnlein indicated in his testimony to the United States Coast Guard investigating officer and at trial that the ship approached the dock at a 10–15 degree angle from the dock. The ship's second mate, who was the watch officer stationed on the ship's bridge, indicated in his statement to the United States Coast Guard investigating officer that the ship proceeded to the dock with her "bow angled in to the dock." Those members of the ship's crew who were interviewed by the United States Coast Guard investigating officer stated that the ship's stern was never any closer than 50–100 ft. from the dock.

31. As the S/S MARJORIE LYKES entered the slip, the tug TEXAS was positioned at the ship's bow and the tug WASHINGTON was positioned at the ship's port quarter aft.

32. As the ship entered the slip, her bow was close to the dock and when the ship's bow was about 400 ft. into the slip, the ship made fast a spring line onto the dock. The spring line was leading astern from the ship's bow. In addition to the spring line, two head lines were put out leading forward and fixed to bollards along the dock. At this time, the stem of the vessel was about 150–200 ft. from the inner dock corner and about 20 ft. out into the slip from the edge of the dock. On orders from the ship, the tug TEXAS worked at varying speeds against the ship's port bow, and Captain Soehnlein utilized the ship's bow thruster to hold the ship's bow in position.

33. As the S/S MARJORIE LYKES proceeded into the slip, Captain Soehnlein was in constant walkie-talkie communication with Chief Officer Christian on the ship's bow who told Captain Soehnlein the distance of the ship's bow off the dock and the position of the ship's stem. While Cap-

tain Soehnlein did have communications with the ship's officer stationed on the ship's stern, he was never told and never asked about the position of the ship's stern. The stern never came close enough to the dock to put stern lines ashore.

34. As positioned, the ship lay at an angle in the slip with her stern away from the dock and over toward the shoal water on the southerly side of the slip. The ship's bow was held fixed in a position with the curve of her starboard bow alongside the dock, held in place by three ship's bow lines, the tug TEXAS and the ship's bow thruster.

35. With the ship's bow held rigidly fixed in position alongside the dock, the ship proceeded to work its own main engine ahead at slow speed (20 r.p.m.) at 1638 hrs. (4:38 p.m.) for 3 minutes, then at 25 r.p.m. for 2 minutes and then at 30 r.p.m. for 8 minutes, with a hard left rudder in an effort to assist the tug WASHINGTON in attempting to push the ship's stern up against the wind toward the dock. However, the ship's stern continued to be blown away from the dock by the strong wind. At 1650 hrs. (4:50 p.m.), the ship was on a heading of 295 degrees, an angle of 73 degrees to the dock. By 1659 hrs. (4:59 p.m.), the ship was on a heading of 311 degrees, an angle of 84 degrees to the dock.

36. At 1700 hrs. and 20 secs. (just after 5:00 p.m.), one of the ship's bow mooring lines parted. Captain Soehnlein ordered the tug TEXAS to leave the ship's bow and shift aft to assist the tug WASHINGTON in attempting to break the swing of the ship's stern to port. At 1703 hrs. (5:03 p.m.), the tug TEXAS arrived at the ship's port quarter aft, alongside the tug WASHINGTON, and proceeded to push wide open against the ship's port quarter aft as the tug WASHINGTON had been doing all along. Two minutes later, at 1705 hrs. (5:05 p.m.), the S/S MARJORIE LYKES was at a right angle to the dock.

37. As the TEXAS and WASHINGTON pushed alongside one another against the after port side of the parallel mid-body of the ship, Captain Soehnlein observed that at times the tugs made some progress in moving the stern toward the dock, but the tugs could not maintain the movement, and the stern swung progressively further south.

38. At 1709 hrs. (5:09 p.m.), the TEXAS was ordered to tow from the stern on a line in order to give it more leverage to pull the stern back to the north. After towing for eleven minutes, the tug's line parted. The ship then sent its own 9 in. circumference mooring line to the tug with the tug's wire pendant and remnant of its line attached. The tug made the remnant of its line fast, and after towing for about 26 minutes between 1727 hrs. (5:27 p.m.) and 1753 hrs. (5:53 p.m.), the line parted again. At the same time, the tug TEXAS overheated a second time. She abandoned the effort and returned to the dock. Throughout this time, the ship's stern continued to set slowly down toward the seawall in spite of the efforts of the two tugs and the ship.

39. There is no evidence that, had the tug TEXAS not left the scene after her second towline parted, the result of the ship finally coming down alongside and against the seawall could or would have been averted or even delayed. The only evidence is that when the TEXAS left the scene, the damage had already been incurred by the Terminal No. 4 dock and the seawall, and the final result was inevitable.

40. Sometime between 1700 hrs. (5:00 p.m.) and 1800 hrs. (6:00 p.m.), the ship's shore captain asked Kerr Steamships to get every available tug in the vicinity to assist the ship. He called GLT, which agreed to call out a third tug, and the Selvick Towing Company, which agreed to call out two tugs. Men had to come from Chicago to man the third GLT tug. The two Selvick tugs needed three hours to come out.

41. The MARJORIE LYKES' bow lines parted and were replaced and slacked as necessary to prevent their further parting. By 1800 hrs. (6:00 p.m.), the winds had increased to 30 knots with gusts to 40 knots. The ship was driven by the winds laterally toward the west/southwest. Her stern went aground on the shoal and her forward port side hit the seawall at 1904

hrs. (7:04 p.m.). Her stem broached the seawall and her stern continued to work across the shoal until the ship came flat alongside the seawall at 2012 hrs. (8:12 P.M.). The seawall was heavily damaged and the fill behind the wall was washed out in places causing sink holes to develop in the pavement. There was sufficient concern on the part of the Milwaukee County Sheriff's Office that traffic on the Hoan Bridge (which parallels the seawall and is elevated above it) was blocked.

42. Before the vessel came alongside, the tug WASHINGTON, which had continued pushing against the after port midbody, left its position, passed astern of the ship, and put a towing line on the ship's starboard quarter aft at 1842 hrs. (6:42 p.m.). After towing for an hour and 21 minutes, the line parted at 2006 hrs. (8:06 p.m.).

43. In the hour prior to the parting of the towline of the tug WASHINGTON, the ship obtained several large tires from one of the stevedore's employees and placed them between the ship's port side and the seawall in an effort to fender any contact in that area.

44. At about 2100 hrs. (9:00 p.m.), Captain Bohl transferred to the tug MISSISSIPPI with two crew members, and was ordered by the GLT office to assist the motor vessel SUNSET which had broken her mooring lines at the Terminal No. 3 dock, just on the other side of the pier from where the S/S MARJORIE LYKES was having her troubles. At the same time, the tug WASHINGTON, which was standing by the S/S MARJORIE LYKES, was also ordered to go to the M/V SUNSET. Both of those tugs arrived at the M/V SUNSET, pushed her back to the Terminal No. 3 dock and held her there until she made fast to the dock with additional mooring lines. The two tugs then returned to the S/S MARJORIE LYKES, arriving at about 2258 hrs. (10:58 p.m.).

45. At 2032 hrs. (8:32 p.m.), the tug WILLIAM O. SELVICK arrived at the S/S MARJORIE LYKES. At 2051 hrs. (8:51 p.m.), another bow mooring line from the ship to the dock parted.

46. At 2110 hrs. (9:10 p.m.) the tug BONNIE J. (SELVICK) made fast on a towing line on the ship's starboard quarter, and at 2115 hrs. (9:15 p.m.), her wire parted. She then took a ship's line at 2215 hrs. (10:15 p.m.). At 2256 hrs. (10:56 p.m.) the WILLIAM C. SELVICK made fast with its wire. By 2324 hrs. (11:24 p.m.), the Selvick tugs had succeeded in dragging the stern of the MARJORIE LYKES across the shoal to a distance of 10 ft. off the seawall.

47. Captain Soehnlein then requested the tug WASHINGTON to push on the port stern. Captain Soehnlein knew the stems of the GLT tugs were not fendered, but believed that greater damage would be done to the ship's rudder and propeller than could be done to the ship's hull by the tugs' stem posts. Moreover, he had asked the GLT tugs to pull from the ship's starboard quarter, but Captain Toth (of the tug WASHINGTON) refused to do so for fear he might become entangled with the Selvick tugs. The tug TEXAS, which had returned to the scene, and the MISSISSIPPI, which had been activated, stood by. The Selvick tugs had well fendered bows, but Captain Soehnlein required them to continue pulling on the starboard quarter as they were making progress and holding the after part of the ship off the seawall.

48. When the two Selvick tugs had the ship's stern somewhat away from the seawall, Captain Soehnlein ordered the tug WASHINGTON to go in between the seawall and the ship and push against the ship's port quarter aft to attempt to get the ship's stern to come further away from the seawall. The tug WASHINGTON complied and ship's stern slowly came further away from the seawall. When there was enough space between the seawall and the ship, the tug WASHINGTON slid ahead somewhat, and the tug MISSISSIPPI joined her, just aft, and also proceeded to shove against the ship's port quarter aft. When the stern had come further away from the seawall, the tug TEXAS also slid in, just aft of the tug MISSISSIPPI, and all three GLT tugs pushed against the ship's port quarter aft.

49. Before midnight, the ship had incurred no damage whatsoever, either from contact with the dock, from contact with the seawall or from any contact with either the tug TEXAS or the tug WASHINGTON pushing against the ship at any time during any of the maneuvers. After midnight, when the GLT tugs were pushing against the ship's port quarter aft, the ship was rolling somewhat and moving up and down due to the heavy seas which had continued to build in the harbor. The tugs were bobbing up and down in the confined area between the ship and the seawall due to the seas and the actions of their own propellers and the ship's propeller in the confined area. On the tugs WASHINGTON and MISSISSIPPI, deckhands were attempting to cushion any contact between the peaks of the tugs' bows with the ship's shell plating by means of hand-held rope doughnut fenders. On the tug TEXAS, which was the furthest aft of the three tugs and was in under the ship's curved stern, the deckhands could not get into a position to attempt to use a hand-held rope doughnut fender because the area was too confined and it was dangerous to be in there.

50. As the three tugs pushed against the port quarter, the waves alongside the seawall were approximately 6 ft. in height. These waves caused the tugs' bows to ride up and down against the hull of the ship, and the lack of fendering on the bows of the tugs caused the contoured stern of the vessel to become heavily indented in numerous places and to be holed in one place.

51. When Captain Soehnlein sent the three GLT tugs between the ship and the seawall, the emergency had existed for over five hours.

52. Most of GLT's tugs on the Great Lakes are equipped with bow fenders similar to those on the tugs TEXAS, WASHINGTON and MISSISSIPPI. No evidence was presented that any of GLT's tugs had ever before been involved in a situation where a fendered tug damaged a ship.

53. After the two Selvick tugs had pulled on long leads off the ship's starboard quarter aft and the three GLT tugs had pushed against the ship's port quarter aft for several hours, the ship's stern was moved some distance away from the seawall but was not completely free. It became apparent that the ship was firmly grounded somewhere by her stern. Captain Soehnlein decided to ballast the ship's bow in order to bring the stern up off the bottom. This was done and the ship finally swung free. With her bow thruster, the ship was turned to head out toward the harbor. All five tugs pushed on the ship's starboard side for almost an hour to finally breast the ship to the Terminal No. 4 dock, port side to the dock, heading out. The ship was tied up at the dock and all five tugs were dismissed.

54. Both Captain Soehnlein and the ship's shore captain, Captain Benson Bowditch testified that the GLT tugs, particularly the tug TEXAS, showed black smoke during the relatively short interval of time that the tugs TEXAS and WASHINGTON were pushing together against the ship's port quarter aft just before and after the ship was perpendicular to the Terminal No. 4 dock. Several of the photographs in evidence show smoke being emitted from the stack of the tug TEXAS when pushing against the ship's side and when increasing her power from idle to full ahead after taking a towline. Other photographs show both the tug TEXAS and the tug WASHINGTON working without any smoke being emitted. Captain Soehnlein also testified to inconsistent engine sounds from the tugs TEXAS and WASHINGTON when they were working together at the ship's port quarter aft and inconsistent wakes from the tugs at various times during the course of the maneuvers.

55. The tugs' engine noise and inconsistent wakes were caused by the heavy seas and not by any problem in the tugs' operation. There is no evidence that the tugs' engines operated in any way other than in accordance with the throttle controls, or that the tugs' captains ever operated the engines other than in accordance with the ship's orders. Following this incident, the tugs' engines functioned properly and no piston rings or fuel injectors were replaced or repaired.

56. When Captain Soehnlein ordered the three GLT tugs in between the ship and the seawall to push against the ship's port quarter aft in the period after midnight, he knew the tugs' configuration and the potential for damage to occur with the tugs working between the ship and the seawall in such heavy seas.

57. The plaintiff's nautical expert, Captain George H. Reid, testified that the lateral thrust capability of the tugs TEXAS and WASHINGTON, and the S/S MARJORIE LYKES operating with her main engine and propeller on a hard left rudder and her bow thruster, should have been sufficient to hold the ship against the wind under the circumstances existing on May 7, 1983, up to a heading of 248 degrees which would amount to an angle of 26 degrees to the Terminal No. 4 dock. The formula used by Captain Reid did not take into account several elements such as the surface current of the water, the angle of approach of the ship to the dock, and the effect of the ship working her engine full astern and emergency full astern. These elements reduce the maximum allowable angle. The evidence shows that when the ship approached the dock and the ship's bow was made fast to the dock, the ship's stern was so far away from the dock that the combination of tugs and ship could not have overcome the force of the wind and seas in order to bring the ship's stern to dock. The cause of the damage was the failure of Captain Soehnlein to closely monitor the weather conditions, and the inability of Captain Soehnlein to judge the effect of the high winds and the rough seas on the docking manuever.

58. The parties have stipulated that the plaintiff sustained damages in the amount of $382,549.84, of which $224,000.00 was paid by plaintiff to the City of Milwaukee in settlement of its claims for dock and sea wall damage, $12,845.37 was spent for civil engineering expertise, and $145,704.47 was expended for hull repairs and related surveys.

59. The defendant agrees that the damages claimed were reasonable and necessary with the exception of $10,000.00 attributable to the cost of reparing the full width of shell plates L–15 and L–16 of the S/S MARJORIE LYKES. The court finds that it was necessary and reasonable for plaintiff to repair the full width of the shell plates and, therefore finds that plaintiffs total damages amount to $382,549.84.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action pursuant to the Admiralty Clause of the United States Constitution, and 28 U.S.C. § 1333.

■ 2. A tug is not a bailee or insurer of a vessel in tow and is not liable as a common carrier but holds only the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the same or similar service. *Stevens v. White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1932). At all times on May 7 and 8, 1983, those in command of the S/S MARJORIE LYKES were in command of the entire operation. They placed the tugs where they wanted them and told the tugs how and when to operate.

■ 3. The first docking attempt was abandoned due to the ship's inability to manage the maneuver under the existing weather conditions and not due to the fault of either party. Moreover, no damage occurred in the first docking attempt.

4. The two tug lines which parted were not defective and did not part because of any inadequacy or improper action on the part of the tugs. In addition to the tug lines which parted, four ship's mooring lines, one Selvick tug towing cable and several mooring lines of the M/V SUNSET also parted. The overwhelming evidence indicates that the lines parted because of the high winds and rough seas.

5. The bow fenders used on the tugs TEXAS, WASHINGTON, and MISSISSIPPI provide adequate protection for vessels and tugs during normal towing operations. A book authored by plaintiff's expert entitled "Shiphandling With tugs," contains diagrams and pictures of tugs similarly fendered. The tugs' bow fenders were not inadequate. The only time damage oc-

curred was when the tugs were ordered to work in an area and manner that, because of the high seas, the ship's captain knew and expected that damage would occur.

■ 6. The reduction of the tug crews from four persons to three persons just prior to the 1983 season of navigation did not contribute to the accident occurring on May 7 and 8, 1983. The evidence does not show that the tugs' engines functioned in any manner other than efficiently and in full response to command.

7. The smoke occasionally emitted from the tugs during the docking attempt was a result of the tugs changing speeds and working hard.

8. The tug TEXAS had some engine heating problems on two occasions during the docking manuevers. The first heating problem occurred during the first docking attempt which was aborted because of the weather conditions with no resulting damage. The second heating problem occurred during the second docking attempt after the ship's bow had breached the seawall and at a time when the disaster which followed was inevitable.

9. Captain Toth of the tug WASHINGTON was justified in refusing Captain Soehnlein's command to go between the two Selvick tugs and take a third line off the ship's starboard quarter, because to do so would risk tangling the tug lines in the WASHINGTON's propeller and could jeopardize the safety of the tug and crew.

■ 10. A fully-manned vessel, operating with the assistance of tugs pursuant to its orders and control, must be operated with due care and reasonable skill and attention to duties. *United States v. Jacksonville Forwarding Co.*, 18 F.2d 39 (5th Cir.1927). Those in charge of the S/S MARJORIE LYKES on May 7 and 8, 1983, who controlled the time of the docking and the movement of the ship and tugs, were negligent in several ways.

11. Captain Soehnlein negligently failed to monitor weather forecasts during the morning of May 7, 1983, so that he did not know about the gale warning and heavy seas predicted for that afternoon and eve-

ning when he made his decision to attempt to dock the S/S MARJORIE LYKES for the second time.

12. During the second docking attempt, Captain Soehnlein was negligent for failing to communicate with the ship's officer on the ship's stern as to the location of the ship's stern with respect to the Terminal No. 4 dock, so that he failed to realize that the ship's stern was never close enough to the dock to put stern lines ashore.

13. During the second docking attempt, Captain Soehnlein was negligent in failing to order the ship to back out of the slip when he knew or should have known that it was prudent to do so and that the tug WASHINGTON and the ship's engine and propeller were not going to be able to overcome the force of the strong winds and heavy seas.

14. The damage which resulted was caused by Captain Soehnlein's failure to monitor the weather, to judge the effect of the strong winds and high seas on the chosen docking maneuver, and to abort the second docking attempt when it should have become clear that the maneuver could not succeed in the face of the strong wind and heavy seas.

15. Lykes was negligent in waiting to request shore fenders until after the ship's bow had damaged the Terminal No. 4 dock and breached the seawall.

■ 16. When Captain Soehnlein ordered the GLT tugs to go between the ship and the seawall, the emergency situation had existed for several hours and was caused by Captain Soehnlein's negligence. Therefore, the ship was not "in extremis" and this doctrine cannot be invoked to absolve the plaintiff of negligence. *National Steel Corp. v. Kinsman Marine Transit Co.*, 369 F.Supp. 498, 512–13 (E.D.Mich. 1972), *aff'd* 492 F.2d 364 (6th Cir.1974).

■ 17. There is no implied warranty of workmanlike service running from an assisting tug to a dominant vessel, but if such a warranty does exist, its application is barred if the vessel actively hinders the tug's performance. *Stevens v. White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 349, 76

L.Ed. 699 (1932). Even if an implied warranty did exist, the actions of the ship's bow lines and bow thruster, which caused the ship to swing to port, actively hindered and may have prevented any chance that the ship and the tugs had to overcome the force of the winds and seas and get the ship's stern over to the dock.

18. The collisions of the ship with the seawall and the GLT tugs were not caused by any fault or negligence on the part of any of the defendants' tugs, but were caused by the negligence of Captain Soehnlein and Pilot McKnight as set forth in paragraphs 11 through 15 above. The defendant is not liable for any of the damages sustained from the docking of the S/S MARJORIE LYKES on May 7 and 8, 1983.

IT IS ORDERED that judgment be entered in favor of defendant and against plaintiffs on all claims asserted in this action.